IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KIMBERLY M., )
)
        Plaintiff, )
)
v. ) 1:22CV859
)
MARTIN J. O'MALLEY,[1] )
Commissioner of Social Security, )
)
        Defendant. )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Kimberly M. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on April 13, 2020, alleging a disability onset date of February 18, 2020. (Tr. at 16, 247-51, 255-56.)[2] Plaintiff's application was denied initially (Tr. at 118-36, 155-63) and upon reconsideration (Tr. at 137-52, 165-69). Thereafter,

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #9].

Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 171-72.) On November 17, 2021, Plaintiff, along with her attorney, attended the subsequent telephonic hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 16.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 36), and on August 16, 2022, the Appeals Counsel denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-7).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264–65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 18.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> cervical degenerative disc disease (DDD) with status post fusion; Crohn's disease; gastroesophageal reflux disease (GERD); migraine headaches; major depressive disorder (MDD) with anxious distress; posttraumatic stress disorder (PTSD); and unspecified cognitive disorder[.]

(Tr. at 18–19.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 19–22.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work with the following, additional limitations:

5

> [Plaintiff] can no more than frequently stoop, kneel, crouch, crawl, or climb stairs and ramps but could only occasionally balance or climb ladders, ropes, or scaffolds; must avoid concentrated or frequent exposure to extreme cold, extreme heat, pulmonary irritants, or hazards. Also, [Plaintiff] was limited to understanding, remembering and carrying out simple and some detailed instructions, defined to mean work activity consistent with reasoning level 4 or SVP 2 occupations as defined by the DOT as learned within 30 days or less; can sustain concentration, attention, and pace sufficient enough to carry out those instructions for two hour intervals over the course of [a] typical eight-hour workday; can work in occupations requiring only occasional interactions with coworkers, supervisors, and the public; involving low stress work defined as having few changes in work setting or work processes with only simple work related decisions.

(Tr. at 22.) At step four of the analysis, the ALJ determined, based on the above RFC and the vocational expert's testimony, that Plaintiff was unable to perform any of her past relevant work. (Tr. at 34.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled under the Act. (Tr. at 35–36.)

Plaintiff now challenges the ALJ's decision in three respects. First, she contends that "[t]he ALJ's decision does not contain a summary or evaluation of Plaintiff's testimony," and that this omission violated Social Security Regulation 16-3p. (Pl.'s Br. [Doc. #17] at 1.) Second, Plaintiff argues that the ALJ "failed to adequately account for the vocationally limiting effects of Plaintiff's migraine headaches in the [RFC assessment]." (Id.) Third, Plaintiff claims that the Appeals Council "erred by refusing to consider new evidence." (Id.) After a thorough review of the record, the Court agrees that the ALJ's failure to address Plaintiff's testimony requires remand. Accordingly, the Court need not address Plaintiff's additional arguments at this time.

Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (Oct. 25, 2017); see also 20 C.F.R. § 404.1529. Moreover, in Arakas v. Comm'r of Soc. Sec., 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

983 F.3d at 95–96. Under SSR 16-3p, in evaluating a claimant's symptoms in light of the entire case record at the second step of this framework, the ALJ must consider the claimant's testimony regarding the limiting effects of the symptoms, along with information from other medical and non-medical sources. SSR 16-3p at *6-*7. Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her

7

symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." SSR16-3p at *9–*10.

In the present case, the ALJ failed to discuss—or even acknowledge—Plaintiff's testimony at the administrative hearing. Instead, the ALJ only addressed statements made by Plaintiff and her father in Function Reports completed in April 2020 and March 2021, respectively. In her decision, the ALJ described these reports as follows:

> The claimant alleged on a disability report that was completed on April 21, 2020, that she suffers from Crohn's disease, PTSD, depression, anxiety, fecal incontinence, migraines, inflammatory arthritis, cataracts, perianal abscess, and cognitive dysfunction, which limits her ability to work (Exh. 3E/2). Andrew Meyer, the claimant's father, assisted in completing a function report on the claimant on March 17, 2021 (Exh. 18E). Mr. Meyer indicated that the claimant's conditions affected her ability for lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, using her hands, and getting along with others (Exh. 18E/14). He further stated that her symptoms of her Crohn's disease caused her to have nausea and vomiting (Exh. 18E/17). He further stated that her GERD caused her to have a lot of hoarseness, sore throat, belching, nausea and vomiting and she was sometimes unable to talk without coughing constantly and clearing her throat which did not seem to work very well to help with clearer speech (Exh. 18E/17). He also stated that due to her cognitive dysfunction, she was unable to remember where she put things, and she had to have mall security help her find her car in the lot many times (Exh. 18E/18). He further stated that she had difficulty with word finding and following directions (Exh. 18E/19).
>
> Despite those allegations, Mr. Meyer indicated on the same function report that the claimant took care of a pet cat, putting food and water out for the cat (Exh.

8

> 18E/21). It was also noted that the claimant could bathe herself (Exh. 18E/23).
> It was further noted that the claimant was able to do very light cleaning, drive a
> car, go out alone and she could go shopping in stores (Exh. 18E/24, 25). Mr.
> Meyer further indicated that the claimant spent time with others in person and
> on the phone, email and texting (Exh. 18E/27).

(Tr. at 22–23.) The ALJ found that "[a]ll the activities that Mr. Meyer reported that the claimant could perform are inconsistent with his previous statements. Mr. Meyer has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. at 23.)

In the next paragraph of the ALJ's decision, without acknowledging or describing any of Plaintiff's subjective complaints beyond the bare list of alleged impairments from her April 2020 Function Report, the ALJ concluded that "claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record," but without any discussion of the Plaintiff's statements in the Function Report or in her testimony. (Tr. at 23) (emphasis added).

Significantly, at the hearing on November 17, 2021—approximately one year and two years after the Function Reports cited by the ALJ— Plaintiff testified at length regarding her physical and mental abilities. At the close of the hearing, Plaintiff's counsel summarized her relevant testimony and related limitations:

> [Plaintiff has] had Crohn's disease for many years, [and] she still has significant
> problems with abdominal pain, nausea and fecal incontinence. And especially
> due to the fecal incontinence, we believe that she would require additional
> breaks during the workday to either change her Depends or just to use the
> facilities.
>
> In addition to that, with [her] migraine headaches, she suffers headaches several
> times per week, which would also interfere with her ability to attend and
> complete work tasks in two hour increments as required . . . to do even unskilled
> work.

9

(Tr. at 79.) In terms of incontinence, Plaintiff testified that she had to change her prior work and could not see patients anymore because her "incontinence had gotten so bad." (Tr. at 54.) She further testified that she could not work due to PTSD and her incontinence, explaining as follows:

> A.  . . . So I – it's just a lot. It's constant bowel movement issue that I have no control over because my sphincter is destroyed from disease and surgery and there's nothing that they can do. I tried everything, even a device that they implanted in me. . . . It's just a very terrible situation, embarrassing.
> . . . .
> Q    [Y]ou mentioned the fecal incontinence. How many bowel movements do you typically have a day?
>
> A    I guess that it's very hard for me [to] give an estimate. So it could be three. It could be ten. Sometimes it could be more than ten if I eat something, I guess, that doesn't get absorbed properly because I've had multiple bowel resections. So I don't absorb normally. It's very unpredictable. And I write it down. I don't know what I can and can't eat.
>
> Q    With the Depends, do you wear them every single day?
>
> A    Yes, I wear [whatever] is cheapest. It's not necessarily Depends, but I also wear like a big Maxi pad that is almost—it looks like an open diaper inside there so that I could change that and not have to pull the Depends because it's like four or five times a day that something comes out and I don't want to smell.
>
> So I take out the pad if it's not a blow out, and that way I can preserve the Depends and put another pad in, if that makes sense.
>
> Q    And do you still have the same number of bowel movements, even though you started taking Humira earlier this year?
>
> A    Oh, yeah. Yeah, I think it's worse because my rheumatologist said maybe you have more Lupus and Humira's going to make the lupus symptoms worse. So I don't know what's going on.
>
> Q    And this fecal incontinence, do you have problems with nausea or abdominal pain?

10

Case 1:22-cv-00859-JEP    Document 19    Filed 03/11/24    Page 10 of 15

> A       So my biggest problem is nausea. And I don't know, like my—I have a lot of, I guess, reflux and probably gastric involvement of my Crohn's. So I get a lot of nausea and I have to take a drug called Zofran. . . . I have to take it every day and now my insurance isn't giving me enough. It's very tough and I'm still nauseous with that. . . . And I get nauseous before a bowel movement.
>
> I don't know if I'm going to throw up, if I'm going to have a bowel movement because I don't have a lot of feeling down there. It's when it—you know, I could feel the nausea and then I could feel the stool hit my skin. But in my rectum I can't really feel what's going on.

(Tr. at 64–66.) Significantly, Plaintiff's reports of up to ten bowel movements a day are consistent with her reports to her providers throughout the time period at issue. The ALJ recounted two of these reports in the administrative decision (see Tr. at 26, 27, 1206, 2866), along with Plaintiff's statement at an April 2020 gastroenterology appointment that "[w]hen she went out for a walk, she would wear a Depends and a pad" (Tr. at 26, 1206).[5] However, the ALJ never addressed if, let alone how, these problems might affect Plaintiff's RFC.

When faced with a substantially similar issue in Dowling v. Comm'r of Soc. Sec. Admin., 986 F.3d 377, 389 (4th Cir. 2021), the Fourth Circuit required remand. Specifically, the Court found that

> [t]here [was] considerable evidence in the record demonstrating that Appellant regularly experienced diarrhea and incontinence, as well as drainage from her anal fissure. Appellant argues that these problems caused her to require bathroom breaks at a frequent, and often unpredictable, rate. Obviously, the need to visit the bathroom many times throughout the day impacts one's ability to work. And yet, the ALJ did not analyze Appellant's need for regular bathroom breaks. Instead, the ALJ simply noted that Appellant "accommodate[d] her drainage and accidents by using pads." J.A. 16. That finding misses the point. Pads may keep Appellant's clothes clean and help reduce the potential for embarrassing accidents. However, they do not save

---

[5] The transcript of the hearing also reflects that Plaintiff had to leave the hearing to go to the bathroom partway through the proceeding. (Tr. at 67.) In addition, Plaintiff's later medical records submitted to the Appeals Council reflect that she underwent an Anorectal Manometry procedure shortly after the hearing, which confirmed findings "consistent with weak anal sphincters and pelvic floor dyssenergia" with a diagnosis of "Full incontinence of feces." (Tr. at 86-87).

11

> Appellant any trips to the bathroom, since the pads need to be changed once they are soiled. On remand, the ALJ should evaluate the frequency at which Appellant needed to use the bathroom and analyze how that restriction impacted her ability to work.

Dowling, 986 F.3d at 389. Notably, in the present case, Plaintiff's attorney specifically questioned the vocational expert regarding breaks during the workday:

> Q [B]ased on your education, training and experience, what would be the typical breaks that are allowed . . . during an eight-hour workday?
>
> A On morning 15-minute, half-hour lunch and 15-minute afternoon.
>
> Q Okay. If a claimant required two additional 10-minute breaks during the workday to use the bathroom, for example, would that have an effect on the claimant's ability to work in the national economy?
>
> . . .
>
> A [Y]es, [the need for additional breaks] would eliminate all work.

(Tr. at 77–78.) In light of this testimony, along with Plaintiff's consistent, but unaddressed, reports that she experienced fecal incontinence throughout the relevant time period, remand is required so that the ALJ may address this issue in the first instance. See also Moore v. Kijakazi, 2022 WL 834295 (E.D.N.C. March 21, 2022) ("Moreover, notably absent from the ALJ's RFC assessment is any discussion of Claimant's testimony from the administrative hearing, and the ALJ is required to consider a claimant's statements about her symptoms, 20 C.F.R. § 416.929(a); S.S.R. 16-3p." (emphasis in original, internal citations omitted)).

Plaintiff further testified that she experienced pain when sitting for an extended period of time due to both spinal pain radiating to her left leg and recurrent rectal abscesses and sores from her frequent stools. (Tr. at 68.) Plaintiff testified that with respect to her ability to sit, "sitting with my rectal abscess has been, you know, the sores from the stool getting on me is difficult too." (Tr. at 68.) Plaintiff further testified that when she has "an active draining

12

abscess down there" she cannot sit and instead has to lay down to rest that area. (Tr. at 68.)
Again, the ALJ failed to acknowledge or address this testimony, nor did she explain the
absence of sitting restrictions in the RFC assessment. See Dowling, 986 F.3d at 388–89; see
also Denise R. v. Kijakazi, 2023 WL 4898288 (D. Md. July 31, 2023) (finding that "the ALJ
does not appear to have evaluated Plaintiff's testimony regarding her ability to sit" in light of
her impairments including incontinence, and "[w]hile it is not necessary that an ALJ address
every piece of a claimant's testimony, the ALJ erroneously ignored Plaintiff's testimony about
her difficulty sitting, which is the central component of sedentary work and material to the
disability determination in this case."); Gravely v. Kijakazi, 2023 WL 2349600 (M.D.N.C.
March 3, 2023) (noting that "[t]he ALJ did not mention or discuss Plaintiff's testimony that
she could not sit more than five minutes at a time, nor did the ALJ otherwise address or
mention any limitations on sitting" and "[i]t is unclear whether the ALJ considered the related
incontinence at all, since it is not mentioned in the decision even though it was a significant
part of Plaintiff's testimony and was reflected repeatedly in the medical records" and
remanding in light of Dowling). Notably, in the present case, Plaintiff's attorney questioned
the vocational expert regarding sitting restrictions, and, as with the need for additional breaks,
the expert testified that the addition of a sit/stand option to the jobs relied upon by the ALJ
would eliminate those positions. (Tr. at 76.) Because the ALJ did not address Plaintiff's
sitting restrictions at all, or even mention the effect of her rectal abscesses on her ability to sit,
the Court cannot follow the ALJ's reasoning, and the sitting limitations would potentially
affect the determination in light of the vocational expert's testimony.

Similar problems are reflected in the ALJ's failure to address Plaintiff's testimony regarding her ongoing migraine headaches. Plaintiff testified that, at the time of the administrative hearing, her migraines occurred "almost daily." (Tr. at 66.) She further indicated that, if she takes her abortive medication early enough, the headaches may "go away in a couple of hours," but that "sometimes they last for days." (Tr. at 66.) She reported the same frequency of migraines despite taking all of her medications as directed, and stated that her doctors "have not found something that works." (Tr. at 66–67.) Significantly, Plaintiff testified that, when her headaches last for days, she has needed to contact her doctor or go to the emergency room "because [she doesn't] know what to do." (Tr. at 66.)

When recounting the medical evidence, the ALJ noted Plaintiff's reports to her neurologist that she experienced migraines "[a]t least weekly, lasting several days" and that her rescue medication, Sumatriptan, worked well "at times." (Tr. at 27.) The ALJ also noted that Topiramate, which Plaintiff took as a daily prophylactic for migraines, caused memory and cognitive problems. (Tr. at 27–28.) The ALJ found that as of August 2021, Plaintiff's migraines were "considered chronic and stable." (Tr. at 28.) Nothing in this discussion explains what, if any, parts of Plaintiff's testimony and reports to her doctors the ALJ found inconsistent with the evidence. Moreover, the Function Report completed by Plaintiff's father—the only subjective evidence discussed by the ALJ—does not address Plaintiff's headache impairment at all. (See Tr. at 22-23.) Accordingly, as with Plaintiff's gastrointestinal impairments, the administrative decision lacks any meaningful—or reviewable—explanation of how the RFC accounts for the symptoms of Plaintiff's headache disorder. In particular, when asked to define "the tolerance for absenteeism in the national economy," the vocational

expert answered that "no more than once a month" would be allowed. (Tr. at 78.) While it is entirely possible that the ALJ could identify reasons for rejecting Plaintiff's testimony that she experienced at least one debilitating headache a week, and therefore would not miss more than one day of work per month due to her symptoms, the ALJ did not make any such findings in her decision.

Ultimately, the ALJ's failure to acknowledge or address Plaintiff's hearing testimony <u>at all</u> in her decision, let alone provide reasons for disregarding the limitations identified by Plaintiff during the hearing, leaves the Court unable to determine the ALJ's reasoning and renders the ALJ's decision unsupported by substantial evidence. These are issues that should be addressed and considered by the ALJ in the first instance.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is REVERSED, and that the matter is REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner is directed to remand the matter to the ALJ for further consideration of Plaintiff's claim. Defendant's Dispositive Brief [Doc. #18] is DENIED, and Plaintiff's Motion for Judgment on the Pleadings [Doc. #16] is GRANTED to the extent set out herein. However, to the extent Plaintiff seeks an immediate award of benefits, her Motion is DENIED.

This, the 11th day of March, 2024.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

Case 1:22-cv-00859-JEP    Document 19    Filed 03/11/24    Page 15 of 15